# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BURTON, HAGLER, and FLEMING
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Captain CHRISTOPHER S. BERGER**
**United States Army, Appellant**

ARMY 20170232

Headquarters, 2d Infantry Division
Christopher T. Fredrikson, Military Judge
Colonel Timothy P. Hayes, Jr., Staff Judge Advocate

For Appellant:  Major Todd W. Simpson, JA; Captain Zachary A. Gray, JA (on brief).

For Appellee:  Colonel Steven P. Haight, JA; Lieutenant Colonel Eric K. Stafford, JA; Major Virginia Tinsley, JA; Captain Jeremy Watford, JA (on brief).

20 March 2019

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

HAGLER, Judge:

In a single assignment of error, appellant challenges his guilty plea to conspiracy to commit sexual assault of a child.[1]  At the time of his trial in 2017, appellant was a 41-year-old Captain serving in the Republic of Korea.  The charges

---

[1] In accordance with his pleas, appellant was found guilty by a military judge, sitting as a general court-martial, of conspiracy to commit sexual assault of a child, conduct unbecoming an officer, and seven specifications of conduct related to child pornography, in violations of Articles 81, 133, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 933, and 934 [UCMJ].  The military judge sentenced appellant to a dismissal and confinement for three years.  Pursuant to a pretrial agreement, the convening authority approved a sentence of a dismissal and confinement for eighteen months.  We review the case under Article 66, UCMJ.

stem from appellant's online activity over several years, from early 2012 through late 2015, during which he solicited, received, possessed, and viewed child pornography. As part of this activity, appellant conspired with "Imelda,"[2] a woman in the Philippines, who agreed to supply him with children for sexual activity. Although we discuss appellant's assigned error, our review ultimately finds no substantial basis to question any of his guilty pleas.

## LAW AND DISCUSSION

The crime of conspiracy under Article 81, UCMJ, has two key elements: (1) that the accused entered an agreement with one or more persons to commit an offense under the UCMJ; and (2) that, while the agreement continued to exist, and while the accused remained a party to the agreement, the accused or at least one of the co-conspirators performed an overt act for the purpose of bringing about the object of the conspiracy. *Manual for Courts-Martial, United States* (2016 ed.) [*MCM*], pt. IV. ¶ 5.b.(1).

Appellant contends neither element was satisfied by the facts elicited during his providency inquiry; thus, he argues, the military judge abused his discretion by accepting appellant's plea to the conspiracy charge. Specifically, appellant argues the agreement was conditional, not complete, and no overt act was performed in furtherance of the conspiracy. We disagree on both points and conclude the military judge had a sufficient factual basis to find appellant guilty of conspiracy.

*Agreement to Commit an Offense*

During providency, appellant testified he contacted "Imelda" via Yahoo Messenger chat and expressed interest in meeting minors for sex. In sum, he said they discussed what the children would do and their ages, cost, locations to meet, his plans to travel to the Philippines, and how he could contact Imelda. The military judge conducted an extensive colloquy with appellant, to include the following:

> MJ: And, you said that you entered into an agreement [with Imelda]. What was the agreement?
>
> Appellant: The agreement was that if I went to the Philippines, that we would meet up and the possibility – or

---

[2] With the military judge's permission, appellant referred to the charged co-conspirator as "Imelda," as he found her full username, "imeldangtulala," difficult to handle. We concur and will do the same throughout this opinion.

to have sex with a minor, with one of her – two of her girls.

MJ:  Okay.  So, was the agreement that you were going to go to the Philippines and meet her and have sex with two of the children that she would provide?

Appellant:  Yes, sir.

. . . .

MJ:  Okay.  Did you specifically ask to have sex with two girls between the ages of 12 and 15?

Appellant:  Yes, sir.

MJ: Did you plan on actually having sexual intercourse? And, I use the word, "sexual intercourse," by placing your penis into their vulvas, was that your intent?

Appellant:  Yes, sir.

MJ:  And, was that the agreement that you had?

Appellant:  Yes, sir.

. . . .

MJ:  Did you agree on a location?

Appellant:  Yes, sir, her house

MJ:  So, did you intend to go to her house and have sex with the two children?

Appellant:  If the opportunity arose, sir.

MJ:  What do you mean by "if the opportunity arose?"

Appellant:  If – if I was able to get away from the family that I was visiting.

Apparently concerned by the conditional nature of some of appellant's words, the military judge followed up by questioning appellant further on the existence of an agreement with Imelda:

> MJ: So, Captain Berger, one might argue that you had an agreement to contact [Imelda], but you hadn't solidified the agreement to actually have sex with the children. What is your response to that? Did you actually have an agreement to have sex with the children or did you just have an agreement to contact [Imelda] if you decided that you wanted to have sex with children?
>
> Appellant: Sir, after reading what I wrote, and it has been a while since I actually wrote it, I would think that the agreement to call would mean that I was free and therefore had the ability to meet. And so, if I would've called, it would have been to meet to have sex with the girls.

Taken as a whole, appellant's testimony reveals that only his ability and opportunity to carry out the agreement were in question, not his resolve to do so or the agreement itself.

In determining whether an agreement existed, the military judge was also able to consider the stipulation of fact and the chat transcripts, which were admitted pursuant to the stipulation of fact.[3] In addition to addressing the elements of the charged conspiracy, the stipulation includes statements consistent with appellant's providence inquiry:

> [Paragraph] 12. . . . In these chats, [appellant] talked about upcoming trips to the Philippines and asked if the sellers had children that he could meet to have sex with. [Appellant] and respective seller then discussed ages of the children, what they would do, how sexually experienced the children were, and how much money [appellant] would have to pay for the experience . . . . In chats with [Imelda], [appellant] went so far as to obtain [Imelda's] cell phone number and Viber contact

---

[3] In response to the military judge, appellant confirmed the statements in the stipulation were true, and he was the author of the chats attributed to his username, "digthis75." We have made no attempt to modify language as it appeared in the chat transcripts.

information (cell phone application for communicating similar to Kakao chat and Facebook Messenger) and determined locations where they could meet once he arrived in Manila.

During their chat sessions in December 2014 and January 2015, appellant and Imelda discussed the ages of the children, what acts they would perform, and the cost. Along with extensive dialogue about images of the children and payment, appellant mentioned he would be traveling to the Philippines in March 2015 and asked, "so tell me how it works i mean where do we meet when i am there." Imelda said she would meet him in the airport and then return to her house, where "the girls will wait in bed."

Within the chats, appellant also specifically inquired about a nine-year-old girl, asking, "Well what does the 9 offer" and "what ages fuck," to which Imelda indicated that the nine, twelve, and fifteen year-olds would have sex. About a month later, appellant again asked, "what ages can have sex," and Imelda answered, "u cn choose . . . what age u like." Appellant replied, "10." Although the negotiations for a prospective March meeting apparently fell through, these discussions provide unmistakable context for their subsequent agreement.

On 12 October 2015, appellant renewed his chat sessions with Imelda. When she offered two girls, ages thirteen and fifteen, "for meet real and fucking show here," along with "lots of nude pics . . . and vids also," appellant responded, "I just want to meet."[4] Imelda replied, "ok." Over the next five minutes, the following exchange ensued:

Appellant: Where in phill [Philippines]

Imelda: manila

Appellant: how do we meet

Imelda: up to u

Appellant: Price also

Imelda: 300 $

---

[4] In a colloquy with the military judge, appellant stated that "meet in real" means to meet in person. Appellant further clarified that by "meet," he meant he was "going to have sex" with the girls.

>Appellant:  what do I get for that
>
>Imelda:  suck fuck
>
>Imelda:  all
>
>Appellant:  How many will you have for me
>
>Imelda:  many up to you
>
>Appellant:  Ok how do I meet you there
>
>Imelda:  we meet in airport?
>
>Appellant:  Hmm how about phone when I get to hotel
>
>Imelda:  heres my phone number

We find an agreement was complete when both appellant and Imelda gave their "ok" to the proposal.  Even though some details were yet to be ironed out (e.g., the number of children, the length of time he would spend with them, the exact location in Manila, how appellant and Imelda would link up), they were in agreement that he would meet with children she provided for sexual acts.  Their chats confirm appellant's providency testimony and show this was not a hypothetical or conditional agreement.  All that remained was execution—for appellant to contact Imelda when he arrived in the Philippines.

*Overt Acts*

Immediately following the chat exchange above, Imelda provided her phone number.  After confirming it was her Viber contact number and that she had the Viber application, appellant replied, "added you."  Less than one month later, on 5 November 2015, appellant traveled from Korea to the Philippines.  Appellant's statements during the providence inquiry confirm these facts:

>I asked for her phone number and her Viber number,
>which she gave both to me and I added them.  Viber is,
>again, a video chat and text message service where you
>can call people around the world using a cell phone, a
>smart phone, anything like that.  So, I added her to Viber
>and then I, on the date specified, I traveled to the
>Philippines, Your Honor.

In our view, each of these acts by appellant—requesting Imelda's phone number, adding her as a Viber contact, and traveling to the Philippines—committed while he was a party to the agreement, satisfies the requirements of an overt act under Article 81, UCMJ. They are independent of the agreement and clearly show the plan was in the execution phase. Appellant does not contest that he committed these acts but argues they are not sufficient as overt acts, primarily because he traveled to the Philippines for an independent, legitimate purpose: to visit his wife and her family. We are not persuaded by this argument.

At trial, appellant's trial defense counsel maintained, and we concur, that appellant's trip to the Philippines could have multiple purposes.[5] Appellant admitted one of these was to have sex with children, as agreed with Imelda, and his testimony confirms this purpose. The military judge questioned appellant about what he did to ensure he could accomplish the object of the conspiracy, and appellant replied:

> Appellant: So, sir, I looked for times, possible times that I could get away. And then, I also had [Imelda's] phone number or Viber number to contact her.
>
> MJ: So, you said you looked for times to get away. What do you mean by that?
>
> Appellant: I looked for times when the family would be busy and they might not notice that I was gone or to make – or – or a way to make a plausible excuse to get away for a couple hours.
>
> . . . .
>
> MJ: Was one of the purposes of traveling to the Philippines to have sex with two minor children?
>
> Appellant: Yes, sir.

We find appellant went to the Philippines not only to visit family, but also with an illicit purpose—to carry out the object of his agreement with Imelda. He knew of this purpose the month before his travel, and he actively looked for opportunities to fulfill it after his arrival, even as he visited with family. Nothing

---

[5] *See, e.g.*, *United States v. Choat*, 21 C.M.R. 313, 317 (C.M.A. 1956) ("The overt act need not itself be a crime; on the contrary, it can be an entirely innocent act . . . . All that is required is that the overt act be a manifestation that the conspiracy is at work.") (citations and internal quotation marks omitted).

in the record suggests he abandoned his illicit purpose or withdrew from the conspiracy before he traveled. Appellant's statements reinforce what his actions make manifest: despite one legitimate purpose for his travel, the conspiracy was at work.

As noted above, during the course of his guilty plea appellant made a few statements that, standing alone and without the context of the full record, might have undermined his providency to the elements of conspiracy. In response, the military judge thoroughly questioned appellant concerning these statements, relevant portions of the stipulation of fact, and the chat transcripts. By doing so, the military judge promptly addressed and resolved any potential issues that might have been inconsistent with appellant's guilty plea.

After considering all the evidence in the record, we find no substantial basis to question appellant's plea to the conspiracy charge, and we are convinced of the providence of his pleas to each offense as charged in the specifications.

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Senior Judge BURTON and Judge FLEMING concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court